**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

HENRY SPITZER,

        Plaintiff,

    v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:17-cv-01736 - DAD - JLT

FINDINGS AND RECOMMENDATIONS
REMANDING THE ACTION PURSUANT TO
SENTENCE FOUR OF 42 U.S.C. § 405(g) AND
DIRECTING ENTRY OF JUDGMENT IN FAVOR
OF PLAINTIFF HENRY SPITZER AND AGAINST
DEFENDANT NANCY BERRYHILL, ACTING
COMMISSIONER OF SOCIAL SECURITY

        Henry Spitzer asserts he is entitled to a period of disability and disability insurance benefits under Title II of the Social Security Act. He argues the Appeals Council erred by not considering new evidence he submitted. In addition, Plaintiff contends the administrative law judge erred in evaluating the medical record, his credibility, and the testimony of a third party. (Doc. 23) For the reasons set forth below, the Court recommends the administrative decision be **REMANDED** for further proceedings.

**PROCEDURAL HISTORY**

        Plaintiff filed an application for disability insurance benefits and supplemental security income on May 5, 2014, alleging disability beginning April 8, 2012. (Doc. 16-3 at 19) The claim was denied initially on July 1, 2014, and upon reconsideration on February 11, 2015. (Doc. 16-4 at 14, 27) Plaintiff submitted a request for a hearing and testified before an ALJ on March 16, 2017. (*Id.* at 19, 36) The ALJ determined Plaintiff was not disabled under the Social Security Act and issued an order

denying benefits on April 5, 2017. (*Id*. at 19-30) The Appeals Council denied Plaintiff's request for review of the ALJ's decision on October 31, 2017. (*Id*. at 2-4) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

Courts have a limited scope of judicial review over disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. *See Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007); *see also Hall v. Sec'y of Health, Ed. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979) ("Congress has mandated a very limited scope of judicial review of the … decisions granting or denying Social Security disability benefits"). When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The court "must consider the record as a whole," including "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citations omitted). Where the evidence may "reasonably support either affirming or reversing a decision," the court may not substitute its judgment for that of the ALJ. *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). Once a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial evidence and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927, 416.929.

### A.    Relevant Medical Evidence

In March 2013, Plaintiff visited Tehachapi Medical to establish care. (Doc. 16-9 at 68) He told Shimeaka Garrett, PA-C, that he had previously been diagnosed with hypertension and ADHD. (*Id.*) Plaintiff reported he had "been looking for work as a plumber for over 2 years but… [had] been continuing with his education." (*Id.*) Ms. Garrett also noted Plaintiff stated he "was unable to afford his associations (sic) dues," and he felt hopeless. (*Id.*) Ms. Garrett diagnosed Plaintiff with anxiety and depression, and she referred Plaintiff "to behavioral health for evaluation for possible temporary disability." (*Id.* at 71)

Dr. Thinh Mai performed the behavioral health intake evaluation on April 2, 2013. (Doc. 16-9 at 64) Dr. Main noted Plaintiff was currently taking Adderall for ADHD, but he had "been off of [the] medication for a few months and [was] struggling with focus and attention." (*Id.*) Plaintiff indicated his symptoms "improve[d] with medication." (*Id.*) Plaintiff also described depression symptoms

3

including: "anxious/fearful thoughts, depressed mood, difficulty concentrating, difficulty staying asleep, excessive worry, racing thoughts, restlessness and thoughts of death or suicide…" (*Id.*) Dr. Mai observed that Plaintiff was "oriented to person, place, time and situation." (*Id.*) Plaintiff exhibited "unremarkable" behavior, with "pressured and excessive" speech. (*Id.* at 66) Dr. Mai opined Plaintiff's memory was intact and his judgment was good, although his attention was "gained, directed and distracted." (*Id.*) Dr. Mai diagnosed Plaintiff with major depressive affective disorder, single episode, and gave Plaintiff a GAF score of 50.[1] (*Id.* at 65, 66) These intake notes were also electronically signed by Dr. Jagdeep Garewal. (*Id.* at 67)

The following week, Plaintiff visited Dr. Garewal for medication management. (Doc. 16-9 at 61) Plaintiff reported that his symptoms were occurring intermittently and were "fairly controlled," which Dr. Garewal noted was an improvement. (*Id.*) Dr. Garewal observed that Plaintiff's speech was appropriate, and he had an "unremarkable" behavior. (*Id.* at 62) Dr. Garewal opined Plaintiff's memory was intact, and his attention was "gained." (*Id.*) He prescribed Lexapro. (*Id.*)

In May and June 2013, Plaintiff continued to describe "anxious/fearful thoughts, depressed mood and diminished interest or pleasure" and reported functioning was "very difficult." (Doc. 16-9 at 59, 56) Plaintiff reported he was taking the medication as prescribed. (*Id.*) Dr. Garewal observed that Plaintiff exhibited an intact memory, gained attention, and unremarkable behavior. (*Id.* at 60, 57) Further, Dr. Garewal opined Plaintiff had "fair" impulse control, insight, and judgment. (*Id.* at 57)

In November 2013, Dr. Garewal opined Plaintiff exhibited "[m]oderate improvement" with the medication, which Plaintiff reported taking "as prescribed." (Doc. 16-9 at 53) Dr. Garewal opined Plaintiff's behavior was unremarkable and his memory was intact. (*Id.* at 54) However, Dr. Garewal observed that Plaintiff exhibited "poor concentration" and his "[a]ttention was [gained] and distracted." (*Id.*) Further, Plaintiff's impulse control was poor. (*Id.*)

In February 2014, Plaintiff visited Mojave Medical Center, where he told M. Eze, FNP, that he

---

[1] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV"). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

had pain in both wrists. (Doc. 16-9 at 32) Plaintiff indicated that when working as a plumber, he was required to use a screwdriver "a good percentage of the time." (*Id.*)

On March 7, 2014, Plaintiff continued to complain of wrist pain, which he described as constant at an "8/10." (Doc. 16-9 at 30) Dr. Ashmead Ali determined that Plaintiff had grasping strength of 3-4/5 with his right hand. (*Id.*) Plaintiff received wrist braces, and Dr. Ali recommended he undergo an MRI on the right wrist. (*Id.*)

The following week, Plaintiff visited Dr. Garewal at Omni Family Health and reported he continued to have "anxious/ fearful thoughts, [a] depressed mood and diminished interest or pleasure." (Doc. 16-9 at 50) Plaintiff was "compliant with medication as prescribed," which continued to be Lexapro and Adderall. (*Id.* at 50, 52) Dr. Garewal observed that Plaintiff appeared disheveled, and his attention was "gained and distracted." (*Id.* at 51) In addition, he opined Plaintiff had fair impulse control, reasoning, judgment, and insight. (*Id.*)

In April 2014, Plaintiff continued to report wrist pain, which he stated was worsening. (Doc. 16-9 at 26) Plaintiff requested a referral for physical therapy. (*Id.*) Dr. Ali found Plaintiff exhibited tenderness in his wrist and indicated Plaintiff should have an orthopedic consultation regarding his wrist pain. (*Id.* at 26-27)

On May 9, 2014, Plaintiff described his right wrist pain as "3-4/10" to Dr. Ali. (Doc. 16-9 at 24) Dr. Ali determined Plaintiff exhibited mild tenderness in the medial aspect and a mild decrease in the range of motion. (*Id.*) Plaintiff continued to report his pain as "3-4/10" in June 2014. (*Id.* at 21)

Dr. A Lizarraras reviewed Plaintiff's medical records and completed a physical residual functional capacity assessment on June 23, 2014. (Doc. 16-4 at 9) Dr. Lizarraras opined Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, sit for "[a]bout 6 hours in an 8-hour workday," and stand and/or walk "[a]bout 6 hours in an 8-hour workday." (*Id.*) Dr. Lizarraras found Plaintiff could occasionally crawl and climb ladders, ropes and scaffolds; and he had an unlimited ability to climb ramps or stairs, balance, stoop, kneel, or crouch. (*Id.*) Dr. Lizarraras also concluded Plaintiff could frequently perform handling (gross manipulation) with the right hand, and he did not have limitations with fingering (fine manipulation) or feeling. (*Id.* at 9)

Dr. Marsha McFarland completed a mental residual functional capacity assessment on June 30,

2014 but noted there was "no opinion evidence from any source." (Doc. 16-4 at 11) Dr. McFarland concluded there was "[n]o evidence of limitation" related to Plaintiff's ability to carry out very short and simple instructions, perform activities on a schedule, and make simple work decisions. (*Id.* at 10) She believed Plaintiff could perform "low-stress work of limited complexity." (*Id.*) In addition, Dr. McFarland opined, "Due to distractibility, contact with the general public should be brief and superficial in nature." (*Id.*)

In July 2014, Plaintiff complained of numbness and tingling in his first, second, and third fingers and reported that he was dropping objects. (Doc. 16-9 at 19) The following month, Dr. Ali determined Plaintiff's grip strength was "4-5" while wearing a brace. (*Id.* at 17)

In August 2014, Dr. Garewal found Plaintiff exhibited "[m]inimal improvement" with medication. (Doc. 16-9 at 47) Plaintiff reported "functioning [was] somewhat difficult," and he continued to have anxiety, a depressed mood, and difficulty concentrating. (*Id.*) Dr. Garewal noted Plaintiff's appearance was appropriate, his behavior was unremarkable, and his attention was "gained and distracted." (*Id.*)

Dr. Ali again tested Plaintiff's grip strength in September 2014 and found it was "3/5." (Doc. 16-9 at 15) Dr. Ali also found Plaintiff had a mild decrease in motion, secondary to his pain. (*Id.*)

Dr. Garewal completed a medical source statement on September 23, 2014. (Doc. 16-9 at 2-10) Dr. Garewal noted he saw Plaintiff "every 1 to 2 months" after beginning to treat him in April 2013. (*Id.* at 2) Dr. Garewal noted Plaintiff had been diagnosed with ADHD and depression, and Plaintiff's symptoms included: poor memory, mood disturbance, emotional lability, social withdrawal or isolation, difficulty thinking or concentrating, hostility/irritability, and generalized persistent anxiety. (*Id.* at 2-3) He noted Plaintiff was taking Lexapro and Amphetamine Salt Combo (Adderall), and the response to treatment was fair. (*Id.* at 3-4)

Dr. Garewal ranked Plaintiff's ability to perform several work-related activities, as good, fair, or poor— with "good" defined as "[a]bility to function in this area is somewhat limited but satisfactory; "fair" being defined as "[a]bility to function in this area is significantly limited (up to 15% reduction in ability to perform task in 8-hour workday) but is not precluded;" and "poor" indicating "[n]o useful ability to function in this area." (*Id.* at 5-6) Specifically, Dr. Garewal opined Plaintiff had a good

6

ability to ask simple questions or request assistance; fair ability to remember work-like procedures, understand and remember very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and week without interruptions from psychologically based symptoms, accept instructions/respond appropriately to criticisms from supervisors, interact appropriately with the public, and maintain socially appropriate behavior. (*Id.* at 6, 8) He indicated Plaintiff 's ability to maintain attention for two hours, perform at a consistent pace without an unreasonable amount of rest periods, get along with co-workers / peers without unduly distracting them, understand and remember detailed instructions, carry out detailed instructions, deal with the stress of semiskilled and skilled work, and adhere to basic standards of neatness and cleanliness was "poor or none." (*Id.* at 6-8) According to Dr. Garewal, Plaintiff exhibited "poor social skills, low tolerance to stress and changes, [and] poor impulse control." (*Id.* at 8) Dr. Garewal concluded Plaintiff had slight restrictions in his activities of daily living; marked difficulties with social functioning; and frequent deficiencies of concentration, persistence, or pace. (*Id.*)

In October 2014, Plaintiff continued to exhibit a mild decrease in range of motion, tenderness, and mild abnormal findings in the right wrist. (Doc. 16-9 at 13) Due to his reports of continued pain, Plaintiff underwent x-rays of his right wrist. (*Id.* at 34) Dr. Michael Edelstein found "no fracture, dislocation or osseous defect." (*Id.*) According to Dr. Edelstein, Plaintiff's joints were well-maintained, and the soft tissues were unremarkable. (*Id.*) He concluded the imaging showed Plaintiff had a "[n]ormal right wrist." (*Id.*)

In December 2014, Dr. Garewal opined Plaintiff was "[d]oing good" and had made "[g]ood progress." (Doc. 16-9 at 40-41) He indicated Plaintiff was taking the medication as prescribed, and counseled Plaintiff on the "[i]mportance of compliance with [the] chosen treatment." (*Id.*) Dr. Garewal directed Plaintiff to return for a checkup in three months. (*Id.* at 41)

Dr. S. Garcia reviewed records related to Plaintiff's physical impairments and completed a physical residual functional capacity assessment on February 4, 2015. (Doc. 16-4 at 20-22) Dr. Garcia noted Plaintiff had a right wrist x-ray in October 2014 that was normal and found "longitudinal evidence… document[ed] chronic right wrist pain" without evidence of significant osteoarthritis. (*Id.* at 22) Dr. Garcia concluded Plaintiff could perform light work, with limitations to occasional crawling

and climbing ladders, ropes, and scaffolds. (*Id.* at 21) Dr. Garcia found Plaintiff was limited to frequent gross manipulation with the right hand. (*Id.* at 21-22)

Dr. L.O. Mallare reviewed Plaintiff's medical records related to his mental health and completed an analysis on February 9, 2015. (Doc. 16-5 at 19) Dr. Mallare noted that Plaintiff had been "prescribed psychotropics for ADHD and MDD," and the "records reviewed describ[ed] mood disturbance associated with situational stress." (*Id.*) Dr. Mallare opined Plaintiff had mild restriction of activities of daily living; moderate difficulties with social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.*) Dr. Mallare concluded Plaintiff could perform simple, repetitive tasks with limited public contact. (*Id.* at 18)

In February and March 2015, Dr. Ali determined Plaintiff continued to have a mild decrease in range of motion, and he exhibited tenderness in the right wrist. (Doc. 16-10 at 52, 54) In addition, Plaintiff had a grip strength of 3/5. (*Id.* at 52)

On March 4, 2015, Dr. Garewal opined Plaintiff was making "[s]ome progress" and had fair insight and judgment. (Doc. 16-10 at 5) He noted Plaintiff took his medication as prescribed, but he was "not having meds approved and so [he had] been struggling." (*Id.* at 4)

Dr. Ali completed a physical residual functional capacity questionnaire on March 23, 2015. (Doc. 16-9 at 73-77) He noted that he had been treating Plaintiff on a monthly basis for two years, and Plaintiff had been diagnosed with right wrist degenerative joint disease. (*Id.* at 73) Dr. Ali noted Plaintiff reported being in constant pain that was "8-9/10," which was "worse with gripping" or twisting. (*Id.*) He also indicated Plaintiff dropped objects, and he had numbness and tingling in the fourth and fifth digits of his right hand. (*Id.*) According to Dr. Ali, Plaintiff had a decreased grip strength, which was 3/5 and decreased flexion and extension. (*Id.*) He opined Plaintiff could sit for at least six hours in an eight-hour day and stand/walk for at least six hours in an eight-hour day. (*Id.* at 75) Dr. Ali indicated Plaintiff could never lift and carry ten pounds, and he could never climb ladders or stairs because he was "unable to use [the right] hand to climb." (*Id.* at 75-76) Dr. Ali opined Plaintiff could not use his right hand to grasp, twist, finger, or reach, but he could perform manipulative activities with his left hand for 80% of an eight-hour day. (*Id.* at 76) Further, Dr. Ali noted Plaintiff should "[a]void temperature extremes" because it "can worsen [the] wrist pain." (*Id.*) He believed

Plaintiff was likely to be absent more than four days per month as a result of his impairments or treatment. (*Id.* at 76)

In May 2015, Dr. Ali determined Plaintiff's range of motion remained decreased, and his ability to flex and extend his right wrist was reduced to 2/5. (Doc. 16-10 at 48) Dr. Ali noted Plaintiff continued to suffer from neuropathy in the right wrist. (*Id.*) Plaintiff repeatedly described having chronic right wrist pain at appointments with Dr. Ali for the remainder of 2015. (*See id.* at 32, 34, 36, 40-41, 45, 46)

In March 2016, Plaintiff told Dr. Ravi Goklaney—who also worked at Omni Family Health— that he was "not taking medication" because his Adderall was not covered by the insurance and he wanted "to try something different." (Doc. 16-10 at 18) Dr. Goklaney prescribed Lexapro and Wellbutrin to Plaintiff and gave him a GAF score of 40.[2] (*Id.* at 19-20)

At a follow-up appointment with Dr. Goklaney in June 2016, Plaintiff reported he stopped taking Wellbutrin "due to [the] side effects" but was "doing better with the [L]exapro." (Doc. 16-10 at 21) Dr. Goklaney terminated the prescription for Wellbutrin and indicated Plaintiff should continue with Adderall and Lexapro. (*See id.* at 22)

On July 1, 2016, Plaintiff told Dr. Ali that his pain was "3-4/10" with medication and "8/10" without the medication. (Doc. 16-10 at 68, 70) Dr. Ali noted Plaintiff continued to use a brace for his right wrist. (*Id.* at 68)

In August 2016—after Plaintiff's date last insured—Plaintiff told Dr. Goklaney that he was "out of medications" and feeling depressed and sad. (Doc 16-10 at 24) At a follow-up appointment in November 2016, Plaintiff said his depression had decreased and he was "sleeping better." (*Id.* at 27)

Dr. Ali completed a second residual functional capacity assessment on March 2, 2017. (Doc. 16-11 at 61-65) Dr. Ali noted he continued to treat Plaintiff on a monthly basis, for right wrist tendonitis and neuropathy in both legs. (*Id.* at 61) He observed Plaintiff had "constant severe (8/10) sharp, throbbing pain" in the right wrist, "with numbness [and] tingling fingers." (*Id.*) According to

---

[2] A GAF score between 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)." *DSM-IV* at 34.

Dr. Ali, Plaintiff had intermittent edema and tenderness, "moderate pain" with flexion and extension of the wrist, and a decreased range of motion. (*Id.*) Dr. Ali noted Plaintiff was taking Gabapentin, Soma, and Tylenol; and these medications caused drowsiness, dizziness, and a decrease in concentration. (*Id.*) He believed Plaintiff could sit for thirty minutes at one time, stand for thirty minutes at one time, and needed periods of walking around during an eight-hour day. (*Id.* at 62-63) In addition, Dr. Ali opined Plaintiff was unable to use his dominant right hand to perform tasks, such as grasping, turning, twisting, fine manipulation, or reaching. (*Id.* at 62, 64) He also indicated Plaintiff could rarely perform postural tasks such as stooping, crouching, crawling, or climbing. (*Id.* at 64) Dr. Ali again concluded Plaintiff was likely to be absent from work more than four days per month. (*Id.*)

**B.    Administrative Hearing Testimony**

On March 16, 2017, Plaintiff appeared at a hearing, where Mr. Koenig represented him before the ALJ. (Doc. 16-3 at 37) Reviewing the evidence to be admitted, Mr. Koenig reported that he had planned "to get an updated mental functional capacity assessment from [Plaintiff's] current treating psychiatrist, Dr. Goklaney," and Plaintiff had an appointment the day before the hearing. (*Id.* at 38) Mr. Koenig said that he assumed Dr. Goklaney would complete a medical source statement and functional capacity evaluation, but "the doctor refused to do it." (*Id.* at 38, 39)

The ALJ inquired whether the record should be held open, and Mr. Koenig indicated that it should not because Plaintiff's request from his psychiatrist was "shut down." (Doc. 16-3 at 38-39) Therefore, the ALJ admitted the evidence previously submitted, including treatment records from Dr. Goklaney "up into the fall of 2016." (*Id.* at 39)

1.    Plaintiff

Plaintiff testified that he lived with his eighty-two-year-old mother, for whom he provided "[a] little bit" of care. (Doc. 16-3 at 40) He said that his sister was the one who took care of his mother, but Plaintiff helped his mother dress, ran errands, shopped for groceries, and paid bills for her. (*Id.*) He reported that he would usually walk to places, such as the liquor store or the park to "sit there and watch the birds." (*Id.* at 41)

He stated he last worked as a union pipe fitter in 2012. (Doc. 16-3 at 42) Plaintiff said his work "changed from journeyman plumber to journeyman pipe fitter," which he did for the last four years of

his employment. (*Id.* at 43, 60) Plaintiff explained the job required him to "move heavy pipes around with cranes," "rig them with rigging straps," and "bolt them together in different stands." (*Id.* at 42) Plaintiff reported he stopped working in April 2012, though he attempted to go back to work in October 2012. (*Id.* at 59-60) He was only able to work a couple weeks in October 2012, because he "got tired too quick" and was physically unable to do the job. (*Id.* at 60) Plaintiff said that when doing regular plumbing previously, he worked "mostly" at commercial buildings and houses on "waste, soil waste and vent piping." (*Id.* at 43)

Plaintiff said he became unable to work around April 2012 due to pain in his wrist from repetitive motions. (Doc. 16-3 at 44) The ALJ observed that Plaintiff was wearing a right wrist brace that covered the middle of his palm to "just above the wrist," and Plaintiff confirmed that he wore the brace all the time, with a Lidocaine patch under the brace to numb it. (*Id.*) He stated he "didn't have the strength and the pain was unbearable," rendering him unable to exert the 80 pounds of pressure his job required. (*Id.* at 45) Plaintiff also said he could not lift and carry things "because of [his] grip." (*Id.* at 49)

Plaintiff said he was unable to work due to "a loss of breath," dizziness, and balance issues. (Doc. 16-3 at 44) Plaintiff explained he had COPD and "neuropathy from the knee down" in both legs. (*Id.* at 45-46) He said that when he was working, he felt dizzy "[a]bout three times a day" for "like five minutes" each time, during which he would "see stars." (*Id.* at 45) Plaintiff stated he was taking Gabapentin, and had been doing so for about two years, which helped with "seeing the stars" and his neuropathy. (*Id.* at 46)

He also reported that he was unable to work due to ADHD, depression, and anxiety. (Doc. 16-3 at 50) Plaintiff said he was unable to "complete a project half the time because [he was] bouncing off the walls." (*Id.*) He explained he would start one task "and then stop, go somewhere else and do something and then stop and neither one gets completed." (*Id.*) Plaintiff stated his depression made him feel that he would not complete tasks on time, and if you cannot do so "they're surely going to fire you." (*Id.* at 52) Plaintiff reported that he did not "stay employed very long and then that [would] … make [him] cry." (*Id.*)

Plaintiff stated he had "some kind of panic attacks… about four times a day." (Doc. 16-3 at 69)

He said that when "[s]omething doesn't go right," he would "just start freaking out," which he said included "yelling and having … little tantrums." (*Id.*) He estimated that each episode lasted "about seven minutes." (*Id.* at 70) Plaintiff stated each panic attack would "come out of the blue or if [he was] in an enclosed building with a lot of people." (*Id.*) He clarified that he was fine with small groups, but would panic if there were "50 people in an enclosed area." (*Id.* at 70-71)

Plaintiff believed that he could be on his feet for two hours, standing or walking, in an eight-hour period. (Doc. 16-3 at 53-54) He stated he could walk for fifteen minutes at one time before needing to rest, or stand still for about an hour at one time. (*Id.* at 54-55) Plaintiff said the store he walked to was "just under a mile" away but took him "about an hour" to walk there because he had to stop and rest. (*Id.* at 54) He believed he could comfortably lift and carry two pounds throughout a workday, explaining he could lift silverware, underwear, and put flowers in a vase. (*Id.* at 53, 56-57) Plaintiff said he had difficulty lifting a gallon of milk, so he would "pour it into another container." (*Id.* at 56) He also testified he sometimes dropped dishes, so he began to use plastic. (*Id.*) Plaintiff reported he did not have difficulty using his fingers for things such as holding a pen, and his problems were only related to gripping and lifting. (*Id.* at 58)

Plaintiff acknowledged that he went to the hospital in 2016 for pancreatitis and reported his doctor stated his pancreas "will burst" if he did not stop drinking. (Doc. 16-3 at 47) Plaintiff stated he had continued to "drink a quart a day to two quarts a day of malt liquor." (*Id.*) However, as of the hearing date, Plaintiff had reduced his drinking to "every other day." (*Id.* at 61)

### 2. Third party witness

Gabriele Spizter Diestel, Plaintiff's half-sister, testified under oath at the hearing. (Doc. 16-3 at 75) She reported that she was registered nurse and employed in critical care. (*Id.* at 76) She said that she tried to see her family, including Plaintiff, "once a week." (*Id.*) According to Ms. Diestel, Plaintiff was "usually laying on the couch" when she visited. (*Id.*) Ms. Diestel reported Plaintiff "became increasingly depressed" around 2012, and Plaintiff demonstrated "difficulty with getting work" and "keeping a job." (*Id.* at 76)

Ms. Diestel believed Plaintiff's most severe impairment to working was "his inability to stay focused." (Doc. 16-3 at 76) She explained that Plaintiff had difficulty "staying on task." (*Id.* at 75)

12

Ms. Diestel said Plaintiff had "difficulty with memory at times," and she would "remind him to do things or repeat instructions." (*Id.*) As examples, she stated Plaintiff's mother would remind him to shower, and Ms. Diestel "had to remind him to shave" prior to the hearing. (*Id.* at 77) Ms. Diestel stated Plaintiff also would "put things into the microwave and … forget that he's left them in there," or put things "where it doesn't belong," such as a utensil in the refrigerator. (*Id.* at 79)

She testified also that Plaintiff did not "have the strength that he used to have at all," and he would drop things. (Doc. 16-3 at 80) Ms. Diestel stated Plaintiff was unable to lift boxes if they needed to put things in storage, and she went to the house to help with any lifting. (*Id.*) She believed Plaintiff was precluded from "climbing any ladders or doing anything like that." (*Id.*)

### 3. Vocational expert testimony

Nick Corso, a vocational expert (the "VE"), identified Plaintiff's past relevant work— using the *Dictionary of Occupational Titles*[3]— as a pipe fitter, DOT 862.281-022; and plumber, DOT 862.381-030. (Doc. 16-3 at 81) According to the VE, the jobs were classified as skilled and required heavy exertion, both as defined by the *Dictionary of Occupational Titles* and as performed by Plaintiff. (*Id.*)

The ALJ asked the VE to "[a]ssume a hypothetical individual with the same education and work background who has the capacity to do light exertion level work with frequent hand controls on the right and frequent right handling; occasional ladders, ropes and stairs and occasional crawling." (Doc. 16-3 at 81-82) In addition, the ALJ indicated the hypothetical individual had a "mental limitation to simple, routine, and repetitive tasks; with occasional superficial interaction with the public." (*Id.* at 82) The VE testified such a person was unable to perform Plaintiff's past relevant work. (*Id.*) However, the VE believed the individual could perform "light, unskilled" work in the national economy. (*Id.*) As examples of available positions, the VE identified: small products assembler, DOT 706.684-022; housekeeping cleaner, DOT 323.687-014; and inspector and hand packager, DOT 559.687-074. (*Id.*)

Next, the ALJ asked the VE to consider the "same individual but in a sedentary exertional

---

[3] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1)

category." (Doc. 16-3 at 82)  The VE testified an individual with these limitations could perform work in the national economy, including: final assembler, DOT 713.687-018; document preparer, DOT 249.587-018; and table worker, DOT 739.687-182.  (*Id.* at 83)  However, if the individual was to be absent three days a month due to psychiatric symptoms, the VE opined the absences "would preclude competitive employment." (*Id.* at 84)

Third, the ALJ asked the VE to consider an individual who could perform work at the light exertional level, but who "could only stand or walk for a maximum of 15 minutes before needing to rest for 15 minutes."  (Doc. 16-3 at 83)  In addition, the ALJ adjusted the manipulative limitations, indicating the hypothetical worker could only perform occasional handling with the right hand.  (*Id.*)  The VE opined unskilled work would not be available because "in order to find jobs [he] would have to look at jobs that are more interactive with other people… where there's more talking than handling."  (*Id.*)

## C.     The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity between the alleged onset date of April 8, 2012, and his date last insured of June 30, 2016.  (Doc. 16-3 at 21)  Second, the ALJ found Plaintiff's severe impairments included: "right wrist tendinitis, attention deficit hyperactive disorder (ADHD), affective disorder, and anxiety."  (*Id.*)  At step three, the ALJ found Plaintiff did not have an impairment or a combination of impairments that met or medically equaled a listing.  (*Id.* at 21-22)  Next, the ALJ determined:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR  404.1567(b), including lifting up to 20 pounds occasionally and 10 pounds frequently, standing and/or walking up to 6 hours in an 8-hour workday, and sitting up to 6 hours in an 8-hour workday, with the following additional restrictions: he can operate hand controls with the right hand no more than frequently, and he can handle items with the right hand frequently.  He can climb ladders, ropes, or scaffolds occasionally, and crawl occasionally, and he is limited to simple, routine, repetitive work, with occasional, superficial interaction with the public.

(*Id.* at 23)  With this residual functional capacity, the ALJ found at step four that Plaintiff was unable to perform any past relevant work through his date last insured.  (*Id.* at 28)  However, the ALJ determined "there were jobs that existed in significant numbers in the national economy that the claimant could have performed" through his date last insured.  (*Id.* at 29)  Consequently, the ALJ

concluded Plaintiff "was not under a disability as defined in the Social Security Act, at any time from April 8, 2012, the alleged onset date, through June 30, 2016, the date last insured." (*Id.*)

**D. Additional Evidence Submitted to the Appeals Council**

On May 25, 2017, Plaintiff submitted a mental residual functional capacity statement completed by Dr. Goklaney on May 15, 2017. (*See* Doc. 16-8 at 2; Doc. 16-3 at 3) Dr. Goklaney noted Plaintiff had been diagnosed with bipolar disorder and anxiety disorder, and he was being treated with Celexa, Seroquel, and Tegretol. (Doc. 19-3 at 2) He believed that for 15% or more of a workday, Plaintiff would not be able to understand and remember very short and detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with or proximity to others without distraction, get along with co-workers or peers, and maintain socially appropriate behavior. (*Id.* at 2-4) Dr. Goklaney indicated that Plaintiff was likely to be unable to work "[m]ore than 30%" of an eight-hour day due to his physical and mental limitations, he and was likely to miss five days or more each month of work. (*Id.* at 4) According to Dr. Goklaney, Plaintiff's impairments, symptoms, and limitations began in April 2012. (*Id.* at 2)

## DISCUSSION AND ANALYSIS

Plaintiff contends the ALJ erred in evaluating the opinions of the treating physicians, the credibility of Plaintiff's subjective complaints, and the statements from his sister. Plaintiff argues these errors resulted in a residual functional capacity that is not supported by substantial evidence, which also adversely affected the testimony obtained from the vocational expert. In addition, Plaintiff asserts the Appeals Council erred by not admitting the statement completed by Dr. Goklaney into the record, and in failing to remand the matter for an ALJ to consider the evidence. (Doc. 23) Defendant argues that the ALJ properly reviewed the record and the decision should be affirmed. (Doc. 24)

**A. Evaluation of the Medical Evidence**

Administrative law judges distinguish between three categories of physicians in reviewing the medical record: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. §

404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. § 404.1527(d)(2).

A treating physician's opinion is not binding upon the ALJ and may be discounted whether another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, ALJ may reject a contradicted opinion of a treating or examining professional for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830.

When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Plaintiff contends the ALJ erred in rejecting the limitations identified by Drs. Ali and Garewal, which conflicted with the opinions offered by the non-examining physicians. Given the conflicts, the ALJ was required to set forth specific and legitimate reasons to support her rejection of Dr. Barragan's opinions. *See Lester*, 81 F.3d at 830.

### 1.    Opinions of Dr. Ali

The ALJ rejected the opinions of Dr. Ali from 2015 and 2017. (Doc. 16-3 at 25) The ALJ observed that in 2015, Dr. Ali "opined the claimant could sit more than two hours without interruption, and he could sit, stand, and walk at least 6 hours in an eight hour day, but he could never lift any weight, climb ladders or stairs, because he was unable to use his hands to climb." (*Id.*) The ALJ also noted Dr. Ali "opined the claimant had to avoid temperature extremes, as it could increase the right wrist pain." (*Id.*) Explaining the weight given to the opinions, the ALJ indicated:

> The undersigned gives little weight to this opinion, because it is not consistent with
> the record  as a whole.  Dr. Ali made very little examination findings in his treatment
> notes, and his findings throughout the alleged period of disability were mild.
> (Exhibits 6F, 7F).  The claimant also only had one imaging study of his right wrist,
> which was unremarkable.  (Exhibit 2F/25). Furthermore, this opinion is inconsistent

with the claimant's activities of daily living, which include doing the laundry, vacuuming, preparing food, filling the dishwasher, and shopping in stores once a month. (Exhibit SE/3-4, 3E/3-4).

(*Id.*) The ALJ observed the limitations identified by Dr. Ali in 2017 were "even more restrictive than [the] previous opinion." (*Id.*) The ALJ rejected the opinion from 2017 as "inconsistent with the record as a whole and with the claimant's activities of daily living." (*Id.*)

>    a.    *Treatment notes*

The Ninth Circuit determined the opinion of a treating physician may be rejected where an ALJ finds incongruity between a treating doctor's assessment and his own medical records, and the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999) (explaining internal inconsistencies within a physician's report supports the decision to discount the opinion of a physician).

The ALJ rejected the limitations identified by Dr. Ali in 2015, in part, because "Dr. Ali made very little examination findings in his treatment notes, and his findings throughout the alleged period of disability were mild." (Doc. 16-3 at 25, citing Exh. 6F and 7F) The ALJ also observed:

> [Plaintiff] treated with Ahmead Ali, M.D., who made very little detailed examination findings. (Exhibits 6F, 7F). On February 23, 2015, the claimant had mildly decreased range of motion secondary to pain. (Exhibit 6F/25). On March 23, 2015, Dr. Ali observed the claimant's grip strength was decreased, at 3/5. (Exhibit 6F/23). The claimant's treatment record also shows that on July 1, 2016, he was wearing a wrist brace on the right.

(*Id.*) This sparse summary of Dr. Ali's treatment fails to acknowledge the repeated objective findings regarding Plaintiff's grip strength and decreased range of motion.

In May 2014, Dr. Ali determined Plaintiff exhibited a mild decrease in his range of motion . (Doc. 16-9 at 24) In August 2014, Dr. Ali determined that Plaintiff's grip strength was "4-5," while wearing a brace. (Doc. 16-9 at 17) The following month, Dr. Ali tested Plaintiff's grip strength and range of motion and found both were decreased. (*Id.* at 15) In February and March 2015, Dr. Ali determined Plaintiff continued to have a decreased range of motion and a reduced grip strength of 3/5. (Doc. 16-10 at 52) In May 2015, Dr. Ali determined Plaintiff's range of motion remained decreased, and his ability to flex and extend his right wrist was reduced to 2/5. (*Id.* at 48) These objective

findings—and others related to edema and tenderness—clearly undermine the ALJ's assertion that Dr. Ali made detailed examination findings.

Because the ALJ fails to explain how these findings in the treatment note are inconsistent with Dr. Ali's opinions of Plaintiff's manipulative limitations— including an inability to twist, grasp, or climb ladders and stairs (Doc. 16-9 at 75-76) — the purported inconsistency with the treatment notes does not support the ALJ's decision to give less weight to the opinions of Dr. Ali.

### b. *Inconsistency with the record*

An ALJ may reject a medical opinion when it is "unsupported by the record as a whole." *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003). When an ALJ believes a physician's opinion is unsupported by the objective medical evidence, the ALJ has a burden to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

In rejecting the limitations identified by Dr. Ali in 2015, the ALJ found the opinion was "not consistent with the record as a whole." (Doc. 16-3 at 25) The ALJ rejected the opinion from 2017 in part because it was "inconsistent with the record as a whole." (*Id.*) In support of this conclusion, the ALJ noted imaging of Plaintiff's right wrist was unremarkable in 2014. (*Id.*) In addition, the ALJ broadly cites to more than 100 pages of medical records, including the treatment notes of Dr. Ali, found in Exhibits 6F and 7F. (*Id.*)

The "unremarkable" imaging supports the ALJ's decision to give less weight to the opinion. However, the ALJ failed to acknowledge numerous objective findings regarding Plaintiff's reduced grip strength and range of motion with flexion and extension of the right wrist. Though the ALJ "need not discuss *all* evidence presented," he "must explain why 'significant probative evidence has been rejected.'" *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (quoting *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981)) (emphasis in original). Because the ALJ engaged in selective reading of

the record, the ALJ erred in rejecting the limitations of Dr. Ali as "inconsistent with the record as a whole."

### c. Plaintiff's level of activity

The Ninth Circuit determined an ALJ may reject an opinion when the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in." *Rollins*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011) (concluding the ALJ set forth specific and legitimate reasons for rejecting a physician's opinion where the assessment was based upon the claimant's subjective complaints, and limitations identified by the doctor conflicted with the claimant's daily activities).

The ALJ concluded the limitations identified by Dr. Ali were "inconsistent with the claimant's activities of daily living, which include doing the laundry, vacuuming, preparing food, filling the dishwasher, and shopping in stores once a month. (Exhibit 5E/-3-4, 3E/3-4)." (Doc. 16-3 at 25) The ALJ fails to explain how these limited activities conflict with the restrictions identified by Dr. Ali. Indeed, in the records cited by the ALJ, Plaintiff indicated he only prepared foods such as "fish stix, grits, frozen pizza, and eggs;" and he needed assistance "picking up the laundry basket." (Doc. 16-7 at 31) In addition, Plaintiff testified that because he had been dropping things, he began to use plastic dishware. (Doc. 16-3 at 56) Plaintiff believed he could comfortably lift and carry two pounds such as silverware and underwear but had difficulty with a gallon of milk. (*Id.* at 56-57)

Given the ALJ's failure to explain how Plaintiff's level of activity conflicts with the limitations identified by Dr. Ali, this factor does not support the decision to give less weight to the opinions.

### d. Conclusion

The ALJ failed to identify specific and legitimate reasons for rejecting the limitations imposed by Dr. Ali, particularly regarding Plaintiff's ability to use his right hand. Thus, the Court cannot find the ALJ's properly evaluated the medical record related to Plaintiff's physical limitations.

### 2. Opinions of Dr. Garewal

In reviewing the medical record related to Plaintiff's mental impairments, the ALJ indicated he gave "partial weight to the opinion of Dr. Garewal, because his opinion that the claimant has marked limitations is inconsistent with the claimant's mental health treatment record, and fails to acknowledge

that the claimant has been inconsistent with his medication compliance." (Doc. 16-3 at 27) On the other hand, the ALJ gave "more weight" to "Dr. Garewal's opinion that the claimant is limited to simple repetitive tasks with occasional public contact," because it was "overall consistent with the record." (*Id.*)

Plaintiff argues "the ALJ did not provide accurate and proper reasons for rejecting [the] portions of Dr. Garewal's opinions." (Doc. 23 at 28) According to Plaintiff, the ALJ mischaracterized the remaining opinions from Dr. Garewal as supporting a finding that plaintiff "is limited to simple repetitive tasks with occasional public contact." (*Id.* at 25) Plaintiff asserts:

> For instance, amongst other areas, Dr. Garewal opined that plaintiff had a "Fair" ability (again, defined as "[a]bility to Function in this area is significantly limited (up to 15% reduction in ability to perform task in 8-hour workday) but not precluded") in the areas of "Remember work-like procedures," Understand and remember very short and simple instructions," "Carry out very short and simple instructions," "Sustain an ordinary routine without special supervision," "Make simple work-related decisions," "Complete a normal workday and workweek without interruptions from psychologically based symptoms," "Accept instructions and respond appropriately to criticism from supervisors," "Be aware of normal hazards and take appropriate precautions," "Set realistic goals or make plans independently of others," "interact appropriately with the general public," and "Maintain socially appropriate behavior." AR/325-327.
> None of these limitations are accurately reflected in the RFC finding that mentally limits plaintiff to "simple, routine, repetitive work, with occasional, superficial interaction with the public."

(*Id.* at 25-26) Plaintiff contends the "fair" limitations "support a finding that plaintiff would have significant limitations with sustaining "simple, routine, repetitive work," as well as with "interaction with the public." (*Id.*)

Further, Plaintiff contends the "marked" limitations were "not 'inconsistent with claimant's mental health treatment record' and do not fail 'to acknowledge that the claimant has been inconsistent in his medication compliance.'" (Doc. 23 at 27) Thus, Plaintiff concludes the ALJ erred in evaluating the limitations identified by Dr. Garewal.

### 1.    Use of the word "fair"

As an initial matter, Plaintiff contends the limitations identified as "fair" support a conclusion that Plaintiff had greater limitations than those assessed by the ALJ. (Doc. 23 at 26) Courts have examined the definition of the word "fair" and have found that it does not indicate an activity or ability is *precluded*. The Eighth Circuit explained:

> The word "fair" is both a measure of ability and disability. It is on the balance between poor ability to function and greater ability to function. A physician's use of the term "fair" does not, on its own, declare that the claimant cannot return to past work. Rather, the term 'fair' requires a review of the entire record in order to judge whether the balance tips toward functional ability or toward disability.

*Cantrell v. Apfel*, 231 F.3d 1104, 1107-08 (8th Cir. 2000). The definition set forth in *Cantrell* was adopted by the Sixth Circuit in *Colvin v. Barnhart*, 475 F.3d 727, 731 (6th Cir. 2007) and has been cited with favor by the Ninth Circuit. *See Chang v. Comm'r of Soc. Sec. Admin.*, 507 Fed. App'x. 698, 699 (2013). In *Chang*, the Ninth Circuit determined "the ALJ did not err in concluding that when [the physician] used the word 'fair' to describe the [claimant's] abilities in a particular area, he implied <u>no disabling impairment</u> in that area." *Id.* (citing *Cantrell*, 231 F.3d at 1107-08, emphasis added).

This Court has determined an ALJ does not err in finding a claimant was not disabled where a physician concluded the claimant had "fair" to "good" work-related abilities— even where the physician also believed there is "a 'fair' likelihood of plaintiff 'emotionally deteriorating in a work environment.'" *Wade v. Astrue*, 2011 WL 4500863 at *4-5 (E.D. Cal. Sept. 27, 2011). Similarly, courts have determined a limitation to "simple, repetitive tasks" incorporates a physician's opinions that a claimant had "both a fair ability to deal with changes in the work setting and complete a normal workday/workweek without interruptions on a consistent basis," despite the fact that a physician also believed there was "a *moderate* likelihood of emotional deterioration." *Podborny v. Astrue*, 2011 WL 1456187 at *2 (C.D. Apr. 14, 2011) (emphasis added). Thus, the use of the word "fair" to describe several of Plaintiff's limitations alone does not undermine the findings of the ALJ.

2. The ALJ's reasoning

As noted above, the ALJ indicated he rejected Dr. Garewal's "opinion that the claimant has marked limitations [as] inconsistent with the mental health treatment record" and for failure "to acknowledge that the claimant has been inconsistent in his medication compliance." (Doc. 23 at 26)

However, the ALJ fails to identify specific inconsistencies with the medical record related to Plaintiff's mental health. (Doc. 16-3 at 27) The ALJ offers only a summary of the record and his conclusion that limitations identified by Dr. Garewal were inconsistent with the treatment. (*See id.* at 26-27) This is insufficient for the ALJ to reject limitations as unsupported by the record. *See Cotton*, 799 F.2d at 1408; *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("The ALJ must do

more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.").  Accordingly, the unidentified inconsistencies do not support the ALJ's decision to reject Dr. Garewal's opinion that Plaintiff had "poor or none" (or "marked") mental abilities, including the ability to maintain attention for two hours, perform at a consistent pace without an unreasonable amount of rest periods, get along with co-workers / peers without unduly distracting them, and to understand and remember detailed instructions.  (*See* Doc. 16-9 at 6-8)

The ALJ erred in rejecting portions of the opinion claiming Dr. Garewal failed "to acknowledge that the claimant ... [was] inconsistent in his medication compliance."  (Doc. 16-3 at 27)  The record indicates that he *was* compliant with his medication through the date of Dr. Garewal's opinion in September 2014, though Plaintiff was not taking medication when he began seeing Dr. Garewal in April 2013.  Once he began treatment, Dr. Garewal repeatedly noted Plaintiff was taking medication as prescribed.  (*See* Doc. 16-9 at 50, 52-53, 56, 59)  The only instances of non-compliance with the medication occurred after Dr. Garewal completed the assessment.  (*See* Doc. 16-10 at 18 [in March 2016, Plaintiff reported he was not taking medication because it was not covered by his insurance] and Doc. 16-10 at 21 [in June 2016, Plaintiff reported he stooped taking Wellbutrin "due to [the] side effects."]).

Though Plaintiff took the medication as prescribed, Dr. Garewal observed that Plaintiff continued to exhibit difficulties with concentration and attention. For example, in November 2013, Dr. Garewal observed that Plaintiff exhibited "poor concentration" and his "[a]ttention was [gained] and distracted."  (Doc. 16-9 at 54)  In March 2014, Dr. Garewal noted Plaintiff continued to be taking medication as prescribed, yet he appeared disheveled, and his attention was "gained and distracted."  (*Id.* at 51-52)  In August 2014, Dr. Garewal indicated Plaintiff continued to have "distracted" attention during the appointment.  (*Id.* at 47)  Thus, the limitations identified by Dr. Garewal were *despite* Plaintiff's compliance with medication.

Because the ALJ failed to identify specific and legitimate reasons supported by the record for rejecting the limitations identified as "poor or none" by Dr. Garewal, the Court finds the ALJ erred in evaluating the record related to Plaintiff's mental abilities.

*///*

**B.      The ALJ's credibility determination**

To evaluate a claimant's credibility, the ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Second, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility by setting forth clear and convincing reasons for rejecting his subjective complaints.  *Id.* at 1036.

An adverse credibility determination must be based on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).  Factors that may be considered include, but are not limited to: (1) the claimant's reputation for truthfulness; (2) the claimant's daily activities; (3) inconsistencies in testimony or between testimony and conduct; (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed treatment; and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to produce the … alleged symptoms," but found his statements "concerning the intensity, persistence and limiting effects of [the] symptoms were not entirely consistent with the medical evidence and other evidence in the record."  (Doc. 16-3 at 24) Plaintiff contends the ALJ erred by failing "to articulate clear and convincing reasons for rejecting [his] testimony." (Doc. 23 at 42)  On the other hand, Defendant asserts the ALJ properly evaluated Plaintiff's testimony, by considering "normal objective findings, evidence of improvement with treatment, and ability to continue education and look for work. (Doc. 24 at 14)

*///*

1        1.    Consistency with the objective medical record

2        In 1984, Congress amended the statutes governing disability to address allegations of pain. *See*

3    *Bunnell*, 947 F.2d at 347; 42 U.S.C. § 423(d)(5)(A).  With the amendment, "Congress clearly meant

4    that so long as the pain is associated with a clinically demonstrated impairment, credible pain testimony

5    should contribute to a determination of disability." *Howard v. Heckler*, 782 F.2d 1484, 1488 n.4 (9th

6    Cir. 1986).  The Ninth Circuit observed,

7            [D]espite our inability to measure and describe it, pain can have real and severe
             debilitating effects; it is, without a doubt, capable of entirely precluding a claimant
8            from working. Because pain is a subjective phenomenon, moreover, it is possible to
             suffer disabling pain even where the degree of pain, as opposed to the mere existence
9            of pain, is unsupported by objective medical findings.

10   *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  Therefore, an ALJ may not base an adverse

11   credibility determination solely upon the medical evidence.  *Id.*; *see also* SSR 96-7p, 1996 SSR LEXIS

12   4, at *2-3 (statements "may not be disregarded solely because they are not substantiated by objective

13   medical evidence").

14       Nevertheless, "conflicts between a [claimant's] testimony of subjective complaints and the

15   objective medical evidence in the record" can constitute "specific and substantial reasons that

16   undermine . . . credibility." *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

17   The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground

18   that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant

19   factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*,

20   261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)

21   ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a

22   factor that the ALJ can consider in his credibility analysis").  Because the ALJ did not base the decision

23   solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff,

24   the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

25       If an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for

26   the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246

27   F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse

28   credibility determination").  Rather, the ALJ must "specifically identify what testimony is credible and

what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible").  The Ninth Circuit explained, "summariz[ing] the medical evidence supporting [the] RFC determination… is not the sort of explanation or the kind of 'specific reasons' [the Court] must have in order to … ensure that the claimant's testimony was not arbitrarily discredited." *See, e.g., Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015).  As a result, "the observations an ALJ makes as part of the summary of the medical record are not sufficient to establish clear and convincing reasons for rejecting a Plaintiff's credibility." *Argueta v. Colvin*, 2016 U.S. Dist. LEXIS 102007 at *44 (E.D. Cal. Aug. 3, 2016).

In *Brown-Hunter*, the claimant argued the ALJ failed to provide clear and convincing reasons for rejecting her symptom testimony. *Id.*, 806 F. 3d at 491. The district court identified inconsistences in the ALJ's summary of the medical record that it gave rise to reasonable inferences about Plaintiff's credibility. *Id.* On appeal, the Ninth Circuit determined the ALJ failed to identify the testimony she found not credible and did not link that testimony to support the adverse credibility determination. *Id.* at 493. The Court explained that even if the district court's analysis was sound, the analysis could not cure the ALJ's failure. *Id.* at 494.  Likewise, here, the ALJ offered little more than a summary of the medical evidence, and he did not clearly identify the statements of Plaintiff that were not credible.

Given the ALJ's failure to "specifically identify what testimony is credible and what evidence undermines the claimant's complaints," the objective medical record fails to support the adverse credibility determination. *See Greger*, 464 F.3d at 972; *Brown-Hunter*, 806 F.3d at 494.

2.      Failure to follow treatment

The Ninth Circuit has stated, "[A]n unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain testimony." *Fair*, 885 F.2d at 603. Therefore, an unexplained failure to comply with a treatment is clear and convincing reason for finding a Plaintiff's subjective complaints lack credibility. *Id.; see also Bunnell*, 947 F.2d at 346.

The ALJ found that Plaintiff's "compliance with medications has been inconsistent throughout the alleged period of disability." (Doc. 16-3 at 26) However, the ALJ failed to address the reasons for

the noncompliance.  As Plaintiff observes, "both Drs. Garewal and Goklaney consistently and repeatedly noted that plaintiff was compliant with his medications."  (Doc. 23 at 41)  In the instances where Plaintiff was not taking medication in 2016, he reported it was because the medication was not covered by his insurance and, upon trying a new medication, because of adverse side effects of Wellbutrin.[4]  (*See* Doc. 16-10 at 18, 21)

The Ninth Circuit determined that the ALJ errs in using a failure to comply with treatment to support an adverse credibility determination where the claimant "could not afford" the treatment.  *See Garrison v. Colvin*, 759 F.3d 995, 1015 n.19 (9th Cir. 2014) *Smolen*, 80 F.3d at 1284 (holding that because the claimant testified that "she had no insurance and could not afford treatment," her failure to comply with medication for her symptoms "is not a clear and convincing reason for discrediting her symptom testimony").  Because Plaintiff explained the isolated instances of his failure to comply with treatment, the noncompliance does not support the adverse credibility determination.

### 3.      Search for work and continuing education

The ALJ observed that "despite alleging disability, the claimant reported to his treating physician that he had been looking for work as a plumber for over two years, but instead he had been continuing his education, which is inconsistent with the claimant's allegation of a disability."  (Doc. 16-3 at 26)  Plaintiff contends the ALJ erred in rejecting his subjective complaints on these grounds because "the only reference to his educational pursuant was in a cryptic notation in his mental intake interview on March 29, 2013 (AR/387) and thereafter there was no evidence showing that this was sustained effort."  (Doc. 23 at 41)

The Ninth Circuit determined an ALJ may discount a claimant's credibility where he has continued to search for work, as holding one's self out as capable of work "cast[s] doubt on a claim of disability." *See Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014).  However, this report was made in March 2013—early in the relevant time period—and there is no evidence in the record that Plaintiff was continuing either in his employment search or in educational pursuits after this time.  The

---

[4]The ALJ did not acknowledge the treatment notes addressing the side effects from Wellbutrin when stating Plaintiff "denied any side effect from medications," though he cited them as evidence supporting Plaintiff's failure to comply with treatment.  (*See* Doc. 16-3 at 26)  This selective review of the treatment record does not support the ALJ's decision.

fact that Plaintiff had been looking for employment in 2013 and continued his education in some manner offers little support to the ALJ's adverse credibility determination.

### 4. Conclusion

When some of an ALJ's reasons for an adverse credibility determination are not supported by the record or are legally insufficient, the Court must consider whether the reliance on invalid reasons was a harmless error. *See Batson*, 359 F.3d at 1195-97 (applying a harmless error standard where the credibility finding was invalid). The ALJ failed to clearly articulate legally sufficient reasons— supported by the record—for rejecting the credibility of Plaintiff's subjective complaints. Moreover, the ALJ failed to identify the testimony being rejected. *See Holohan*, 246 F.3d at 1208 ("general findings are an insufficient basis to support an adverse credibility determination"); *Greger*, 464 F.3d at 972 (an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints"). As a result, the ALJ's errors cannot be considered harmless, and the ALJ erred in evaluating Plaintiff's credibility.

## C. Remand is Appropriate in this Matter

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Applying the *Smolen* factors to this case, the ALJ failed to set forth legally sufficient reasons to reject the physical and mental limitations assessed by the treating physicians. The rejection of the

limitations clearly impacted the residual functional capacity and the questions posed to the vocational expert to determine whether Plaintiff could perform his past relevant work or other work in the national economy. In addition, a remand for further proceedings regarding the credibility of a claimant is an appropriate remedy. *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the district court's order remanding for further proceedings where the ALJ failed to explain with sufficient specificity the basis for rejecting the claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's] subjective complaints"). Therefore, the matter should be remanded for the ALJ to re-evaluate the medical evidence and hearing testimony to determine Plaintiff's physical and mental residual functional capacity.[5]

## FINDINGS AND RECOMMENDATIONS

For the reasons set forth above, the Court finds the ALJ erred in evaluating the medical evidence and the credibility of Plaintiff's subjective complaints. As a result, the Court should not uphold the administrative decision.[6] *See Sanchez*, 812 F.2d at 510.

Based upon the foregoing, the Court **RECOMMENDS**:

1. The matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

2. The Clerk of Court be **DIRECTED** to enter judgment in favor of Plaintiff Henry Spitzer and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within 14 days of the date of service of these Findings and Recommendations, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the Objections shall be filed and

---

[5] In doing so, the ALJ is encouraged to review the May 15, 2017 opinion of Dr. Goklaney to determine whether the opinion relates to the adjudicated period and, if so, to address whether the limitations identified affect Plaintiff's mental residual functional capacity.

[6] Because remand is appropriate on these issues, the Court declines to address the remaining arguments presented in Plaintiff's opening brief.

served within 14 days of the date of service of the Objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Judge's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **June 20, 2019**                          **/s/ Jennifer L. Thurston**
                                                 UNITED STATES MAGISTRATE JUDGE